IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER POTTS, | ) | |
| | ) | CIVIL ACTION NO. 3:16-35 |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| HARTFORD LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I. Introduction

Before the Court are motions for summary judgment by Jennifer Potts, Plaintiff (ECF

No. 56) and Hartford Life and Accident Insurance Company ("HLAIC" or "Hartford Life"),

Defendant. (ECF No. 59.) The issues have been fully briefed (*see* ECF Nos. 57, 58, 60, 61, 62,

63, 64, 65, 66, 67) and both motions are ripe for disposition. For the reasons that follow,

Plaintiff's motion will be **DENIED** and Defendant's motion will be **GRANTED**.

### II. Jurisdiction

This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as Plaintiff's claim

arises under federal law. Venue is proper under 29 U.S.C. § 1332(e)(2).

### III. Background

#### A. Procedural History

Plaintiff initiated this lawsuit by filing a complaint in the Western District of

Kentucky on September 21, 2015. (ECF No. 1.) Plaintiff's complaint alleged "Breach of

Contract" and "Breach of Fiduciary Duty." (*Id.*) On October 15, 2015, Defendant filed a

motion to dismiss Plaintiff's "Breach of Fiduciary Duty" claim (ECF No. 6) as well as an answer. (ECF No. 5.) On January 11, 2016, Defendant filed a motion to transfer this case to this Court (ECF No. 25.), which Plaintiff did not oppose. (*See* ECF No. 20.)

An Initial Rule 16 Scheduling Conference was held before this Court on March 8, 2016. (ECF No. 33.) After mediation proved unfruitful (*see* ECF No. 40), the Court entered a Scheduling Order granting the parties leave to brief the motion to dismiss under the law of the Third Circuit. (ECF No. 41.) This Court then granted Defendant's motion to dismiss Plaintiff's "Breach of Fiduciary Duty" claim on August 9, 2016. (ECF No. 47.) Thus, the only claim left at this juncture is Plaintiff's "Breach of Contract" claim.

### B. Factual History

This case involves Defendant's denial of Plaintiff's benefits for long-term disability under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101, *et seq.* ("ERISA"). The following facts are undisputed.

Plaintiff was employed with Denny's, where she worked as a General Manager from January 7, 2010 through April 25, 2012. (ECF No. 63 at 1.) Through her employment with Denny's, Plaintiff participated in an employee welfare benefit plan ("Plan"). (*Id.* at 1.) The Plan provides for both short-term disability ("STD") and long-term disability ("LTD") (*Id.* at 1-2; ECF No. 58 at 1-2.); these benefits are funded by an insurance policy ("Policy") issued by Defendant. (ECF No. 61 at 1.) Under the Policy, "Disability or Disabled means You are prevented from performing one or more of the essential duties of: 1) Your Occupation during the Elimination Period; 2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less

than 80% of Your Indexed Pre-Disability Earnings; and 3) after that, Any Occupation." (AR. 0028.)

Plaintiff ceased work on April 26, 2012, after being diagnosed with Fibromyalgia and Thoracic Disc Disease. (ECF 58 at 2.) Plaintiff applied for STD benefits immediately after ceasing work. (*Id.*) On April 30, 2012, Defendant determined that Plaintiff could not perform her job duties and approved Plaintiff's claim for STD benefits, effective April 26, 2012. (*Id.*) Defendant paid Plaintiff STD benefits for the maximum time period allowed under the policy. (*Id.*) On January 18, 2013, after reviewing medical reports from several medical specialists who had treated Plaintiff in the preceding months, Defendant determined that Plaintiff was disabled from her own occupation and approved Plaintiff's claim for LTD benefits. (ECF No. 63 at 3-4.)

Plaintiff continued to receive LTD benefits for the next twenty-four (24) months— the entirety of the "Own Occupation" period. (ECF No. 58 at 2; AR. 0224.) When the Own Occupation period ended, Defendant terminated Plaintiff's LTD benefits, effective January 1, 2015. (ECF No. 63 at 12.) Plaintiff appealed Defendant's decision, and Defendant denied Plaintiff's appeal. (*Id.* at 17.) This lawsuit followed.

Because Plaintiff alleges that Defendant improperly denied her LTD benefits based on her medical conditions, it is necessary to review Plaintiff's treatment history and Defendant's reviews of Plaintiff's claims for benefits. While the record before this Court is quite voluminous, this Court will set forth a concise summary of the uncontested facts most relevant to the pending motions.

*1. Plaintiff Ceases Work and is Awarded Short and Long-Term Disability Benefits*

In April, 2012, Dr. Kern diagnosed Plaintiff with Fibromyalgia and noted that Plaintiff had subjective symptoms of "leg pain/weakness/fatigue." (AR. 1005.) Dr. Kern indicated that Plaintiff could not return to work at that time. (*Id.*) On April 26, 2012, Plaintiff ceased work and was shortly thereafter awarded STD benefits. After receiving STD benefits, Plaintiff continued to be treated by Dr. Kern for a variety of issues, including, but not limited to, fibromyalgia, chronic pain in various parts of her body, depression, adjustment reaction, and other emotional disturbances. (*See* AR. 1000-1003, 0997, 0979-80, 0976, 0992-93, 0972-73.) On at least two occasions, Dr. Kern indicated in her notes that Plaintiff might need to see a psychiatrist. (AR. 1003, 0977.)

Plaintiff also was seen by a pain management specialist, Alice Jones, DNP. On October 1, 2012, Ms. Jones filled out Defendant's "Attending Physician's Statement of Functionality" ("APSF") and reported that Plaintiff's "primary diagnosis is chronic pain/syndrome, hip pain." (AR. 0942-43.) Ms. Jones further noted that she was "unable to determine" Plaintiff's functional capacity, and stated that Plaintiff "needs to be referred for functional capacity tests." (AR. 0943.) On November 11, 2012, Ms. Jones filled out a form letter sent by Defendant, in which she stated that Plaintiff "needs functional capacity testing." (AR. 0905.)

Defendant approved Plaintiff's claim for LTD benefits on January 18, 2013, effective November 1, 2012, after determining that Plaintiff was disabled from her own occupation. (AR. 0290-0293; ECF No. 63 at 4.) The letter was signed by "Tanya A. Walsh, Ability Analyst[,] Hartford Life and Accident Insurance Co." (AR. 0292.)

4

Plaintiff continued to be seen by various medical professionals, and Defendant regularly requested information from these providers about Plaintiff's medical conditions. On July 26, 2013, Ms. Jones checked the boxes on a form stating that Plaintiff could perform "light" and "sedentary work" on a "full-time basis." (AR. 0730; AR. 0733.) Defendant then contacted Dr. Kern and asked whether she concurred with Ms. Jones' opinion. Dr. Kern noted that she had not seen Plaintiff since April and would "defer to pain mgmt." (AR. 0692-93.)

Plaintiff met with Dr. Kern on September 13, 2013. Following the appointment, Dr. Kern wrote a letter in which she stated that "I understand by both your correspondence and from the patient that Pain management stated she was able to perform light duty." (AR. 0685.) However, Dr. Kern stated that Plaintiff "proves to be a hard case," and that "it is my opinion that she remain out of work." (*Id.*) Dr. Kern further noted that Plaintiff had an appointment on October 10, 2013, with a chiropractor, Dr. Rizzo, who "is going to do a Functional Capacity test on her to see her ability to do work." (*Id.*) Ultimately, Plaintiff did not complete the functional capacity test because Dr. Rizzo was not certified to administer it and other providers were prohibitively expensive. (AR. 0119.) Defendant did not offer to pay for Plaintiff to undergo a functional capacity test.

In a letter dated June 2, 2013, Dr. Rita Kammiel, Plaintiff's psychiatrist, noted that Plaintiff was unable to work because of "depression, lack of motivation, poor concentration, and trouble coping with physical pain." (AR. 0786.) On October 5, 2013, Dr. Kammiel filled out Defendant's "Attending Physician's Statement of Disability" ("APSD") form, indicating that Plaintiff suffers from chronic pain syndrome, depression, and bipolar disorder. (AR.

0676-687.) Dr. Kammiel also reported that Plaintiff had "No Ability" or "Minimal Ability" in eleven (11) out of twelve (12) work-related activities. (*Id.* at 0677.)

In a letter to Defendant dated November 20, 2013, Dr. Kern wrote "Please note, I am not treating any condition—but pt. has diagnosis of fibromyalgia & thoracic disc disease. She is unable to stand for long periods of time or sit." (AR. 0674.) Dr. Kern further stated "I think it is unreasonable to think she can work full time." (*Id.*)

Plaintiff returned to Dr. Kern on January 8, 2014. Dr. Kern noted Plaintiff's various diagnoses, stated that Plaintiff reported tenderness when pressure was applied to her upper back, and opined that while "[a]lone either of her diagnoses may not qualify her" for Social Security benefits, "her significant depression along with Thoracic radiculopathy/Fibromyalgia make for a poor work candidate." (AR. 0596.) Plaintiff saw Dr. Kern again on May 8, 2014. Dr. Kern again noted Plaintiff's various diagnoses, stated that Plaintiff "recoils from light touch to the chest wall, upper extremity, and upper back," and reiterated that, while she might not qualify for Social Security, she is a "poor work candidate." (AR. 0593.)

Plaintiff returned to Ms. Jones, the pain specialist, on February 12, 2014 (AR. 0430-431), March 14, 2014 (AR. 0428-429), and April 11, 2014. (AR. 0426-427.) During each of these visits, Ms. Jones listed Plaintiff's diagnoses, noted that Plaintiff had been placed on disability, and stated that a physical examination of Plaintiff revealed "tenderness" in her back that radiated to her sides, as well as hypersensitivity to touch. (*See* AR. 0430-431; AR. 0428-429; AR. 0426-427.) No evidence has been presented that Ms. Jones ever revised her

opinion that Plaintiff could perform full-time "light" and "sedentary work." (*See* AR. 0730; AR. 0733.)

Around the same time, Plaintiff began seeing Diana Hewlett, DNP, a pain management specialist who worked in the same practice as Ms. Jones. Plaintiff met with Ms. Hewlett on May 9, 2014 (AR. 0424-425), June 6, 2014 (AR. 0422-423), July 18, 2014 (AR. 0420-421), August 15, 2014 (AR. 0418-419), September 12, 2014 (AR. 0415-416), October 10, 2014 (AR. 0412-413), November 7, 2014 (AR. 0409-410), and December 5, 2014. (AR. 0406-407.) Ms. Hewlett's write-ups from these visits were extremely similar. In each one, she listed Plaintiff's diagnoses and reported that Plaintiff's physical examination revealed tenderness in her back and supporting muscles that radiated out to her sides, as well as elbow tenderness and hypersensitivity to touch. Notably, during this extensive course of treating Plaintiff for pain, Ms. Hewlett never stated that she disagreed with her colleague Ms. Jones' July, 2013 statement that Plaintiff could perform "light" and "sedentary work" on a "full-time basis." (*See* AR. 0730; AR. 0733.)

After being placed on LTD under her Policy with Defendant, Plaintiff filed for Social Security Disability benefits. Her claim was initially denied on February 14, 2013. (*See* AR. 0629-639.) Plaintiff appealed. In January, 2014, Plaintiff testified at a hearing before the Administrative Law Judge ("ALJ"). (*See Id.* at 0629.) On May 19, 2014, the ALJ denied Plaintiff's appeal. (*Id.*) The ALJ found that Plaintiff suffered from "severe impairments" such as Fibromyalgia, Thoracic Herniatations, Major Depressive Disorder, Bipolar Disorder, and Adjustment Reaction. (*Id.* at 0631.) However, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically

equals the severity" necessary to qualify for Social Security Disability benefits. (*Id.* at 0632.) The ALJ noted that "claimant's subjective allegations are unsupported by the record," and further stated that "the medical evidence simply does not corroborate the level and effect of her alleged symptoms." (*Id.* at 0636.) The ALJ further stated that Plaintiff "has the residual functional capacity to perform light work." (*Id.* at 0634.) However, the ALJ listed various restrictions on Plaintiff's physical activities regarding her return to work, and stated that Plaintiff should only work in a low-stress environment that is slow paced and requires minimal contact with others. (*Id.*)

The day after the ALJ denied Plaintiff's Social Security Disability appeal, Dr. Kern responded to a letter that Defendant had sent her inquiring into Plaintiff's condition. Dr. Kern indicated that Plaintiff was not capable of performing sedentary full-time work. (AR. 0621.) Dr. Kern stated that Plaintiff "cannot stand for long periods of time, or sit." (*Id.*) Dr. Kern also indicated that she did not expect Plaintiff's ability to work to change in the future. (*Id.*)

On June 1, 2014, Dr. Kern filled out an APSD form provided by Defendant, and stated that Plaintiff reported pain in her chest, back, arms, and legs. (AR. 0611.) Dr. Kern noted that Plaintiff's prognosis was "fair/poor." (*Id.*) However, Dr. Kern noted that Plaintiff "sees pain management monthly" and that Dr. Kern was "only treating chole[sterol]." (*Id.*) Dr. Kern did not fill out the part of the form that assessed Plaintiff's work-related abilities and restrictions. She noted that Plaintiff's work abilities were "not assessed this visit," and advised Defendant to "consult pain management." (*Id.* at 0612.)

In early October, Dr. Kammiel filled out a functional capacity form provided by Defendant, and noted that Plaintiff had "No Ability" or "Moderate Ability" on ten (10) of the eleven (11) work-related activities that Dr. Kammiel assessed. (AR. 0598.) Dr. Kammiel also noted that Plaintiff was suffering from bi-polar disorder and chronic pain syndrome. (AR. 0597-599.) Plaintiff saw Dr. Kammiel again on November 7, 2014. Dr. Kammiel stated that Plaintiff had bi-polar disorder and was "unable to work due to impact of physical pain on her mood and depression." (AR. 0579-580.)

*2. Plaintiff's Own Occupation Period Ends, and Defendant Investigates Whether Plaintiff Meets the Definition of Disabled Under the Any Occupation Standard*

Under Plaintiff's Policy, her LTD benefits expired on November 1, 2014, two years after they went into effect. (*See* AR. 0028.) On November 11, 2014, Defendant wrote to Plaintiff explaining that her LTD benefits had lapsed, and that "you must be considered totally disabled... in order to continue to be eligible for LTD benefits." (AR. 0240.) In other words, because the Own Occupation period had ended, Plaintiff could only continue to receive LTD benefits if she were unable to work "Any Occupation." Defendant noted that it was investigating whether Plaintiff was fully disabled as required for her to continue to receive LTD benefits. (*Id.*) Defendant further advised Plaintiff that any benefits she received after November 1, 2014 (when her Own Occupation benefits lapsed) "should not be construed as an admission of continued liability." (*Id.*) The letter was signed by "Tanya R. Walsh, Senior Ability Analyst[,] Hartford Life and Accident Co." (*Id.*)

Over the next six months, Defendant reviewed Plaintiff's case to determine whether she was disabled under the Any Occupation standard. Defendant obtained two doctors

9

from Medical Consultants Network to conduct record reviews of Plaintiff's medical file. (ECF No. 58 at 2.) Plaintiff was not physically examined by either of these physicians. (ECF. No. 65 at 4.) Both physicians were licensed and Board Certified. (ECF No. 63 at 9.) Neither was licensed to practice medicine in Pennsylvania. (ECF No. 65 at 4.)

The first review was conducted by Dr. Akshay Sood. (AR. 0561-567.) Dr. Sood reviewed 168 pages of Plaintiff's medical records. (AR. 0561.) Dr. Sood also contacted two of the physicians who had treated Plaintiff. Dr. Kern would not speak with Dr. Sood, but she transmitted a message to him through her nurse, who reported that Plaintiff could not be touched because everything hurt her. (AR. 0564.) Dr. Sood had better luck with Ms. Hewlett, who worked alongside Ms. Jones and served as one of Plaintiff's pain specialists. According to Dr. Sood, Ms. Hewlett indicated during their phone conversation that she still believed that her colleague Ms. Jones' report from July 26, 2013, was accurate. (*Id.*) In Ms. Jones' July 26, 2013 report, she stated that Plaintiff could perform "light" and "sedentary work" on a "full-time basis." (AR. 0730; AR. 0733.)

After reviewing Plaintiff's medical records and speaking with Dr. Kern (albeit via her nurse) and Ms. Hewlett, Dr. Sood determined that Plaintiff could return to full-time work. (AR. 0565.) However, Dr. Sood noted certain "medically necessary functional limitations and/or restrictions" regarding Plaintiff's work abilities. (*Id.*) For instance, Dr. Sood stated that Plaintiff "can never climb ladders or stairs or balance or operate at heights or drive commercial vehicles or operate heavy equipment" and cannot "bend, twist, squat, crouch or stoop." (*Id.*) Dr. Sood also noted that, in an eight-hour work shift, Plaintiff could only "sit one hour at a time for a total of six hours," could only "stand for 30 minutes at a

time for a total of four hours," and could only "walk for 30 minutes at a time for a total of two hours." (*Id.*)

The second review was conducted by Dr. Kathleen Seibel, a psychiatrist. (AR. 0553-559.) Dr. Seibel attempted to speak with Dr. Kammiel, Plaintiff's psychiatrist, but the receptionist told Dr. Siebel that Dr. Kammiel would charge him for the time she spent on the phone with him. (*Id.* at 0557.) Dr. Siebel consulted with Medical Consultants Network, which advised her to go forward with the review notwithstanding her inability to speak with Dr. Kammiel. (*Id.*)

Upon finishing her review, Dr. Siebel stated that, based on the dearth of psychiatric records, the illegibility of the few notes written by Dr. Kammiel, and the fact that Plaintiff had never undergone a "complete, thorough psychiatric evaluation that is legible," it was "unclear" which psychiatric symptoms were being monitored. (*Id.* at 0558.) Dr. Siebel stated "I do not agree that this claimant has impairment from a psychiatric disorder based on the records available for me to review." (*Id.* at 0557.) Dr. Siebel observed that "the intensity of treatment does not support impairment secondary to a psychiatric disorder," and concluded that "there is no objective information that supports restrictions or limitations secondary to a psychiatric disorder." (*Id.*)

After Drs. Sood and Siebel submitted their findings, Defendant performed an "Employability Analysis Report" ("EAR") to determine which occupations Plaintiff could perform given the limitations and restrictions noted by Drs. Sood and Siebel. (AR. 0512-531.) The "Ability Profile," which listed all of Plaintiff's limitations in one, single-spaced column, was almost two full-pages long. (*Id.* at 0515-516.) The report identified six

occupations that Plaintiff could perform given her restrictions. (*Id.* at 513.) All six of the occupations would allow Plaintiff to earn more than the minimum amount required by her Policy. (*Id.*) Based on the EAR, Defendant determined that Plaintiff was not totally disabled as required for her to continue to receive LTD benefits during the Any Occupation period.

On December 31, 2014, Defendant informed Plaintiff, via letter, that it was terminating her LTD benefits effective January 1, 2015. (AR. 0224.) The letter stated that, based on Drs. Sood and Siebel's independent reviews of Plaintiff's medical file, Defendant did not believe that Plaintiff was totally disabled. The letter detailed the above-stated restrictions that Dr. Sood believed were medically necessary for Plaintiff to return to work, and listed the six job matches that were produced by the EAR given Plaintiff's restrictions and salary requirements. (*Id.* at 0227.) The letter informed Plaintiff how to file an appeal. The letter was signed by "Tanya R. Walsh, Senior Ability Analyst[,] Hartford Life and Accident Insurance Co." (*Id.*)

### 3. Plaintiff's Appeal and Defendant's Subsequent Review

Plaintiff appealed the decision. (AR. 0496-501.) In her appeal letter, Plaintiff raised several "issues" with Defendant's decision. Plaintiff alleged that her LTD benefits were terminated "without any medical support," that Defendant improperly failed to have Plaintiff undergo a functional capacity test, that Defendant used an inappropriate employability test, and that Defendant improperly required her to apply for Social Security benefits to show that she was totally disabled. (*Id.* at 0497-498.) To support her appeal, Plaintiff filed a form completed by Dr. Kern, in which Dr. Kern stated that Plaintiff was restricted to sitting a maximum of 2 hours in an 8-hour workday, and further stated that

12

Plaintiff was unable to participate in full-time sedentary employment. (AR. 0487-488.) Dr. Kern filled out this form on March 12, 2015. However, the last time Dr. Kern had actually seen plaintiff was on November 7, 2014. (AR. 0216.)

In her appeal letter, Plaintiff further requested that Defendant identify whatever additional information Defendant believed it needed for Plaintiff's claim to be granted, and requested that Defendant "obtain a functional capacity evaluation." (AR. 0484-485.) Defendant responded to these requests in a letter, dated July 13, 2015. (AR. 0220.) Defendant stated that "a full explanation of why [Plaintiff's] claim was terminated was given" in the termination letter. (*Id.*) Defendant further stated that it would not arrange for a functional capacity evaluation, because "the issue is [Plaintiff's] work ability as of 12/31/2014." (*Id.*) This letter was signed by Mary Floyd, Appeal Specialist[,] Hartford Life and Accident Insurance Co." (*Id.*)

In its review of Plaintiff's appeal, Defendant obtained three additional independent medical opinions from Maureen Smith Ruffell, M.D., Board Certified in Psychiatry, Dr. James Boscardin, M.D., Board Certified Orthopedic Surgery, and Dr. Brian Peck, M.D., Board Certified Rheumatology. (ECF No. 63 at 13.) None of these physicians is licensed to practice medicine in Pennsylvania.

Dr. Ruffell completed her review on August 6, 2015. (AR. 0360-374.) Dr. Ruffell noted that she reviewed "[a]ll records provided by the Hartford." (*Id.* at 0360.) Dr. Ruffell also noted that she had called Dr. Kemmiel's office on multiple occasions, and sent Dr. Kemmiel written questions concerning her treatment of Plaintiff, but that Dr. Kemmiel never responded. (*Id.* at 0374-376.) Dr. Ruffell noted that, based on her review of Plaintiff's

13

medical file, "there is no indication that the claimant is psychotic, unable to exercise adequate every day judgment, immobilized by her depression or unable to care for herself." (*Id*. at 0367.) Dr. Ruffell further noted that "I did not find any documentation of a cognitive exam showing any significant memory, concentration or attention deficit." (*Id*.) Dr. Ruffell further stated that "[w]hile there is sparse information about [Plaintiff's] actual daily functionality," the fact that Plaintiff's medical file indicated that Plaintiff planned a trip to Germany in May of 2013, and the fact that she regularly travelled 6-hours to visit her pain specialists, were "inconsistent with the claim of a severe condition that precludes work activity." (*Id*.) Dr. Ruffell also observed that Plaintiff's psychiatric care appeared to be limited to "medication management sessions every 3 months" with Dr. Kammiel, a course of treatment which "is not consistent with what would be expected for a severe condition." (*Id*. at 0368.) Dr. Ruffell ended her report by stating that "I did not find information that supports signs of severity that would preclude work activity despite her symptoms if she were motivated to return to the workplace." (*Id*. at 0373.)

Dr. Peck's report was also issued on August 6, 2015. (AR. 0340-348.) Dr. Peck contacted Dr. Kern by telephone on July 16, 2015, at 12:45 p.m. (*Id*. 0340.) Dr. Peck reports that Dr. Kern stated that Plaintiff was unable to perform full-time sedentary work due to her pain. (*Id*. at 0341.) However, Dr. Peck noted that Dr. Kern had previously "outlined [restrictions and limitations] consistent with medium work" on a disability form from April of 2012. (*Id*. at 0343.) After performing a record review of the notes and reports from Ms. Hewlett, Ms. Jones, and Drs. Kern and Kammiel, reviewing imaging studies such as x-rays and MRIs, and listing Plaintiff's likely diagnoses, Dr. Peck concluded that "[Plaintiff] is

14

capable of performing light level work as defined by the DOL-DOT on a full-time basis for the time period in question." (*Id.* at 0347.)

Dr. Boscardin also completed his review on August 6, 2015. (AR. 0351-357.) Dr. Boscardin reviewed "[a]ll records provided by the Hartford." (*Id.* at 0351.) Dr. Boscardin stated that his review was limited to "orthopedic issues." (*Id.* at 0355.) Dr. Boscardin reviewed the imagining studies in Plaintiff's, such as MRIs and x-rays, and noted that the images "indicate degenerative changes, but nothing that would cause a significant neurological or functional limitation." (*Id.* at 0354.) Dr. Boscardin attempted to speak with Ms. Jones, one of Plaintiff's pain specialists, but Ms. Jones never returned his call. (*Id.*) However, Dr. Boscardin states that he spoke with Dr. Kern on July 30, 2015, at 10:25 a.m.; Dr. Kern "opined" that Plaintiff was able to perform light-duty work as of January 1, 2015, but stated that psychological issues might impair her ability to function in a full-time job.[1] (*Id.*) Dr. Boscardin concluded that Plaintiff was able to perform full-time light level work "8 hours a day, 40 hours a week." (AR. 0355.) He noted that Plaintiff had no restrictions on grasping or typing, could walk and stand for up to an hour at a time for a maximum of three hours each day, could lift up to twenty pounds, and that Plaintiff had no restrictions for sitting, though she should be allowed to shift positions for comfort as needed. (*Id.*)

---

[1] Plaintiff does not deny that this conversation occurred. But Plaintiff states that "there is no evidence of this conversation." (ECF 63. at 15.) However, there is evidence—Dr. Boscardin's personal knowledge of this conversation, as detailed in his report. Moreover, Plaintiff has not come forward with any evidence to support her speculation that this conversation did not actually occur.

15

In consideration of the reports submitted by these independent medical reviewers, as well as the other information in Plaintiff's file, Defendant denied Plaintiff's appeal in a letter dated August 11, 2015. (AR. 0214-220.) The letter noted that Defendant's review of Plaintiff's claim "has been conducted separately from the individuals who made the original decision to terminate benefits and without deference to that decision." (*Id.* at 0214.) The letter noted that Plaintiff's "claim file has been reviewed in its entirety" (*Id.*), and listed nine (9) additional sources of information that were considered during the appeal. (*Id.*) The letter provided a chronology of Defendant's review of Plaintiff's claim, from its initial denial to the appeal decision, and summarized the findings of all five (5) independent doctors who had reviewed Plaintiff's file. (*Id.* at 0215-219.) Defendant stated that based on Plaintiff's medical information, the opinions of Plaintiff's treatment providers (i.e. Dr. Kern, Dr. Kemmiel, Ms. Hewlett, and Ms. Jones), and the reviews provided by the independent reviewing physicians, Defendant determined that Plaintiff was capable of performing "sedentary to light duty work" as of January 1, 2015. (*Id.* at 0219.) The letter further stated that the EAR, which had listed occupations that accommodated Plaintiff's restrictions and satisfied her compensation requirements, remained valid. (*Id.*) The letter was signed "Mary Floyd, Appeal Specialist[,] Hartford Life and Accident Insurance Co." (*Id.*)

Approximately six weeks after Defendant denied her appeal, Plaintiff filed this lawsuit.

## IV.    Legal Standards

### A.    Summary Judgment

"Summary judgment is appropriate only where ... there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir.2010) (*quoting Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n. 6 (3d Cir.2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir.2000) (*quoting Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial."

17

*Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

### B. ERISA

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "Thus, when an employee benefit plan grants discretionary authority to a plan administrator, a court must apply the deferential standard of arbitrary and capriciousness." *McDonald v. Appleton Papers Inc. Ret. Plan*, No. CIV.A. 3:13-181, 2014 WL 4660683, at *3 (W.D. Pa. 2014), *citing Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir.2012); *see also Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009) ("When the administrator has discretionary authority to determine eligibility for benefits... the decision must be reviewed under an arbitrary and capricious standard."). "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (internal citations omitted).

"The arbitrary and capricious standard is also applicable where reviewing decisions are made by parties other than the administrator, so long as the plan provides that the administrator can delegate the duty to another party, and the administrator properly designated that duty." *Cipriani v. Liberty Life Assurance Co. of Boston*, No. 4:12-CV-1335, 2015 WL 5923454, at *2 (M.D. Pa. 2015), *citing Parelli v. Bell Atl.–Pa.*, No. 98–3392, 2000 WL 764914, at *3 (E.D. Pa. 2000). "However, if the plan does not include a provision that allows the administrator to designate others to carry out fiduciary responsibilities, evaluate claims, or construe the terms of the plan, then any delegation of that discretion would be unauthorized and any determinations made by an unauthorized third party would be subject to a less deferential de novo standard of review." *Cipriani*, 2015 WL 5923454 at *2 (internal citations omitted).

## V.   Discussion

### A. Applicable Standard of Review

The parties do not dispute that the Policy gives Defendant the discretion to determine Plaintiff's eligibility for benefits. (*See* ECF No. 63 at 2.) However, Plaintiff claims that Defendant improperly delegated its decision-making authority in violation of the Policy, and therefore contends that this Court should apply a *de novo* standard of review. (*See* ECF No. 57 at 2-4.) Defendant asserts that it did not delegate any decision-making authority, and that its decision to terminate Plaintiff's benefits is therefore entitled to an arbitrary and capricious standard of review. (*See* ECF No. 64 at 4-7.)

Plaintiff's improper delegation argument is straightforward. The Policy states that "We have full discretion and authority to determine eligibility benefits and to construe and

19

interpret all terms and provisions of The Policy." (AR. 0027.) "We" is defined as "the insurance company named on the face page of The Policy." (AR. 0031.) The face page of the Policy names "Hartford Life & Accident Insurance Company." (AR. 0001.) Thus, the Policy delegated discretionary authority only to HILAC. (ECF No. 57 at 3.) However, it is undisputed that the people who made the claim decision were formally employed by Hartford Fire Insurance Company, not HILAC. (ECF No. 64 at 2.) Plaintiff contends that the fact that the decision-makers were not employed by HILAC constitutes improper delegation and entitles her to *de novo* review. (*See* ECF No. 57 at 2-4; ECF No. 62 at 6-8.)

Defendant responds by stating that it did not delegate decision-making authority because the people who made the claims decision "were acting as agents of, and on behalf of, Hartford [Life]." (ECF No. 64 at 2.) To support this contention, Defendant notes that Hartford Life and Hartford Fire are subsidiaries of the same holding company and that the holding company "does not transact any business" (ECF No. 60-2 at 2), but that "for administrative purposes, Hartford Fire pays the salaries of all employees of [the holding company's] subsidiary and affiliate companies." (*Id.* at 3.) Defendant asserts that the persons who terminated Plaintiff's benefits and upheld that decision on appeal were "solely responsible for adjudicating LTD claims under insurance policies issued by HLAIC," and "were not responsible for adjudicating any claims under insurance policies issued by Hartford Fire." (*Id.*) Defendant further asserts that "at all times" the persons making Plaintiff's claim decisions were "acting on behalf of HILAC and with the authority of HILAC." (*Id.*) Defendant further states that "Hartford Fire is not associated in any way with the Policy or the adjudication or payment of claims arising thereunder." (*Id.*) Finally,

Defendant notes that the persons who signed Plaintiff's claim decision letters were identified in the letters as employees of "Hartford Life and Accident Insurance Co." (*see* AR. 0214-19, 0224-28) and that the letterhead contained the same "The Hartford" logo that appeared directly above the "Harford Life and Accident Insurance Company" on the face page of Plaintiff's Policy. (*See* AR 0001.)

Based on the evidence discussed above, this Court finds that Defendant has established that Hartford Life—not Hartford Fire—made the benefits decisions that Plaintiff challenges. It is undisputed that the terms of the policy vested Hartford Life with discretionary authority. Therefore, Plaintiff's claims are subject to the deferential arbitrary and capricious standard of review.

This Court notes that at least three federal district courts in the Third Circuit have been presented with very similar factual circumstances in recent years. Each of these courts found that the ERISA defendant did not improperly delegate decision-making authority, and therefore held that the decisions to deny or terminate benefits would be subject to review under an arbitrary and capricious standard.

In *Lucas v. Liberty Life Assur. Co.*, 2014 U.S. Dist. LEXIS 184860 (E.D. Pa. 2014), plaintiff was insured under a plan that gave Liberty Life "sole discretion" to interpret the policy and determine eligibility for benefits. *Id*. at 1. However, Liberty Mutual, not Liberty Life, paid the employee who denied plaintiff's appeal. *Id*. at 22. The court rejected Plaintiff's contention that "Liberty Mutual made the benefits determination." *Id*. The court noted that it was "apparent throughout the administrative record that those individuals [who were making eligibility decisions] were acting as agents of Liberty Life; sending correspondence

21

on behalf of Liberty Life and ultimately being supervised by Liberty Life." *Id*. at 23-24. The court found that Liberty Life made the benefit determination because there was "simply no evidence that Liberty Mutual had any involvement in the benefits determination, other than issuing paychecks to the agents of Liberty Life." *Id*. at 24. Therefore, the court held that the denial of plaintiff's claim would be subject to the arbitrary and capricious standard of review. *Id*.

The district court reached the same conclusion in *Cipriani v. Liberty Life Assurance Co. of Boston*, No. 4:12-CV-1335, 2015 WL 5923454 (M.D. Pa. 2015), a case with extremely similar facts to *Lucas*. Like plaintiff in *Lucas*, plaintiff in *Cipriani* "acknowledge[d] that the plan gives Liberty Life this discretionary authority," but claimed that *de novo* review was appropriate because "Liberty Life delegated this function to Liberty Mutual, an unauthorized third party." *Id*. at 3. In response, Defendant noted that Liberty Mutual employees who are assigned to work for Liberty Life, and who make eligibility decisions regarding Liberty Life's policies, "generally devote 100% of their time working for Liberty Life" and are "under the control and ultimate supervision of the officers and board of directors of Liberty Life." *Id*. at 4. The court found that while the decision-makers were paid by Liberty Mutual, they were acting on behalf of, and under the control of, Liberty Life. *Id*. at 6. Thus, Liberty Life, not Liberty Mutual, had discretion over eligibility determinations. *Id*. Therefore, "there was no unauthorized delegation of authority" *Id*. at 6, and denial of plaintiff's claim would be subject to review based on an arbitrary and capricious standard. *Id*.

22

Similarly, in *Shatto v. Liberty Life Assur. Co*, 2016 U.S. Dist. LEXIS 131097 (E.D. Pa. 2016), plaintiff argued for a *de novo* standard of review "because Liberty Mutual made the claims decisions, rather than Liberty Life, and because there is no provision in the Policy which allows delegation of the authority to handle and decide claims." *Id*. at 21. The court found that Liberty Life, not Liberty Mutual, had authority over plaintiff's claim and appeal. *Id*. at 29. For instance, while "letters to Plaintiff bore the Liberty Mutual logo," they also "displayed a return address for Liberty Life and were mailed in Liberty Life envelopes," *Id*. at 28; plaintiff was advised that his appeals should be made to Liberty Life, *Id*.; the signature block for plaintiff's Appeal Review Consultant stated that she worked for "Liberty Life Assurance Company of Boston, A Liberty Mutual Company," *Id*. at fn. 7; and "correspondence to Plaintiff from the company coordinating the independent medical examination referred to Liberty Life, not Liberty Mutual." *Id*. at 29. The court held that, like the plaintiff in *Lucas*, "[p]laintiff has not adduced evidence showing that Liberty Mutual was involved in Liberty Life's processes for benefits determinations other than by issuing paychecks to the personnel assigned to Plaintiff's claim." *Id*. at 28. Therefore, "the appropriate standard of review is the deferential arbitrary and capricious standard." *Id*. at 30.

Unlike in the cases cited above, Liberty Life is not the defendant here—Hartford Life is. However, the facts here are very similar to the cases involving Liberty Life, and the same conclusion follows. Hartford Life had express authority to determine eligibility benefits. While the discretion was exercised by Ms. Walsh and Ms. Floyd, who were formally employed by Hartford Fire, these persons were clearly acting as agents of Hartford

23

Life. Defendant has presented uncontested evidence that "Ms. Walsh and Ms. Floyd were solely responsible for adjudicating LTD claims under insurance policies issued by HLAIC," and "were not responsible for adjudicating any claims under insurance policies issued by Hartford Fire." (ECF No. 62-2 at 3.) In fact, "Hartford Fire is not associated in any way with the Policy or the adjudication or payment of claims arising thereunder." (*Id.*) Instead, Hartford Life is fully responsible for all aspects of adjudicating claims for LTD benefits. (*Id.*)

The lengthy record of communication between Plaintiff, her medical providers, and Hartford Life further establishes that the decision-makers were acting as agents of Hartford Life. For instance, the letters that Ms. Walsh and Ms. Laberge sent to Drs. Kern and Kammiel had "Hartford Life and Accident Insurance Co." in the signature block below their names, and did not include any reference to Hartford Fire. (*See, e.g.*, AR. 0622; AR. 0674; AR. 929; AR. 608; AR. 682.) Moreover, the letters denying Plaintiff's claim for LTD benefits and appeal, signed by Ms. Walsh and Ms. Floyd, respectively, both had "Hartford Life and Accident Insurance Co." in the signature block below their names, and did not mention Hartford Fire. (*See* AR. at 214-19; AR. 224-28.) In fact, Plaintiff has not pointed to a single correspondence with anyone who identified himself or herself as acting on behalf of Hartford Fire.

Plaintiff relies on *Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079 (M.D. Ala. 2006) to advance her argument that *de novo* review is appropriate. However, *Anderson* does not apply here for several reasons. For one, *Anderson* is a non-binding case from a different circuit. More importantly, the facts in *Anderson* are vastly different from the facts in this case. In *Anderson*, the court found that the insurance issuer, Unum Insurance

24

Company, had improperly delegated decision-making authority to UnumProvident. *Id*. at 1086-87. In reaching this conclusion, the court relied on a "multi-page General Services Agreement entered into between UnumProvident and its subsidiar[y] Unum, which indicates that Unum assigned claims and administration duties to UnumProvident." *Id*. at 1086 (internal citations to the record omitted). Pursuant to the agreement, UnumProvident provided "comprehensive claims management services," including but not limited to "[r]eview of claims and medical files." *Id*. at 1087. In fact, the agreement explicitly stated that UnumProvident was an independent contractor, not an agent or employee of Unum. *Id*. By contrast, Plaintiff has not pointed to any agreement indicating that Hartford Fire will provide claims management services and, as explained above, the people who Hartford Fire paid were acting as agents of Hartford Life. Thus, *Anderson* is inapposite to this case.

Plaintiff has not presented any evidence that Hartford Fire was involved in the decision to terminate her benefits, other than the fact that the persons who made the decisions were formally employed by Hartford Fire. This Court finds that Hartford Life sufficiently established that it retained the discretion that it had under the plan, and that Hartford Life was the entity that made the claims decisions. Therefore, this court will subject the termination of Plaintiff's LTD benefits to the arbitrary and capricious standard of review. *See Lucas*, 2014 U.S. Dist. LEXIS 184860 at *24; *Cipriani*, 2015 WL 5923454 at *7; *Shatto*, 2016 U.S. Dist. LEXIS 131097 at *29.

Plaintiff further asserts that Hartford Life waived its argument that the standard of review was altered from *de novo*. Specifically, Plaintiff claims that, despite the fact that Hartford Life bore the burden of establishing that the Policy granted discretion and that the

25

discretion was exercised by persons authorized to do so, Hartford Life "relegated its argument on these two elements... to a footnote" in its motion for summary judgment. (ECF No. 62 at 6.) The Court agrees with Plaintiff that Defendant could have done a more thorough job fleshing out its argument in its motion for summary judgment. However, this Court does not find Plaintiff's argument compelling.

To support her argument, Plaintiff cites *Lunn v. Prudential Ins. Co. of Am.*, 283 F. App'x 940 (3d Cir. 2008), where the Third Circuit stated that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waved." *Id.* at 943. However, *Lunn* and this case are dissimilar. In *Lunn*, the Third Circuit stated that the District Court improperly failed to convert a motion to dismiss into a motion for summary judgment when the District Court considered evidence that was not in the pleadings. *Id.* at 942. However, the appellant never raised the issue on appeal. *Id.* In a footnote, appellant cited cases holding that district courts are limited to evidence presented on the face of the complaint when deciding a motion to dismiss, but appellant "d[id] not challenge the District Court's consideration" of the evidence outside the face of the pleadings in his case. *Id.* at 943. The Third Circuit held that appellant had waived the argument because he had failed to raise it and because the cases discussing the relevant rule were only presented in a footnote.

Unlike the appellant in *Lunn*, Defendant has actually raised the issue that the footnote discussed. In the body of Defendant's motion for summary judgment, Defendant asserts that "Hartford is vested with discretionary authority to determine eligibility for benefits" (ECF No. 60 at 13); the footnote follows this sentence and provides a detailed

explanation of that assertion. Further, Defendant attached to its motion for summary judgment a three-page sworn affidavit from Ms. Annette Moore, Director of Litigation and Appeals for the Group Benefits Department at The Hartford, in which Ms. Moore describes the relationship between Hartford Life and Hartford Fire and explains that the decision-makers were agents of Hartford Life. (*See* ECF No. 60-2 at 2-4.) Finally, Defendant spends approximately five pages of its brief in opposition to Plaintiff's motion for summary judgment arguing why the decision-makers were agents of Hartford Life, and why an arbitrary and capricious standard of review is therefore appropriate. (ECF No. 64 at 9-14.) In sum, this Court finds that Defendant has clearly raised the issue, and that it is therefore not waived.

In conclusion, this Court finds that Hartford Life exercised the discretion with which it was vested under the Policy. Therefore, Plaintiff's claim will be subject to review under an arbitrary and capricious standard.

### B. The Arbitrary and Capricious Standard

"Where an ERISA plan grants the plan administrator discretionary authority to determine eligibility for benefits, we will uphold the administrator's decision unless it is arbitrary and capricious." *Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Companies*, 644 F. App'x 205, 209 (3d Cir. 2016), *citing Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120–21 (3d Cir.2012) (internal citations omitted). "An administrator's decision is arbitrary and capricious if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011),

27

*quoting Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993) (internal quotation marks and citations omitted).

"Plaintiff has the burden of proof that the Plan Administrator's decision to deny benefits is an arbitrary and capricious decision." *Brandeburg v. Corning Inc. Pension Plan For Hourly Employees,* No. CIV A. 04-1314, 2006 WL 2136481, at *1 (W.D. Pa. 2006), aff'd, 243 F. App'x 671 (3d Cir. 2007). "Under this narrow standard, the reviewing court is not free to substitute its own judgment for that of the plan administrator." *McDonald,* 2014 WL 4660683 at 4 (internal citations omitted). "When reviewing an administrator's factual determinations, we consider only the evidence that was before the administrator when he made the decision being reviewed." *Fleisher,* 679 F.3d at 121 (internal citations omitted); *Killian v. Hartford Life & Accident Ins. Co.,* No. CV 16-1377, 2017 WL 429905, at *10 (E.D. Pa. 2017).

"In deciding whether an administrator's conclusion is arbitrary and capricious, courts consider procedural and structural factors of the decision making process." *Patrick v. Reliance Standard Life Ins. Co.,* No. CV 15-169-SLR-SRF, 2016 WL 4573877, at *9 (D. Del. 2016), report and recommendation adopted, No. CV 15-169-SLR/SRF, 2016 WL 5662138 (D. Del. 2016), aff'd, No. 16-3980, 2017 WL 2459832 (3d Cir. 2017). "Whereas '[t]he structural inquiry focuses on the financial incentives created by the way the plan is organized,' i.e., whether there is a conflict of interest, 'the procedural inquiry focuses on how the administrator treated the particular claimant.'" *Miller v. Am. Airlines, Inc.,* 632 F.3d 837, 845 (3d Cir. 2011), *quoting Post v. Hartford Ins. Co.,* 501 F.3d 154, 162 (3d Cir.2007). "[W]hen an insurance company both funds a benefits plan and possesses the discretion to

determine eligibility under the terms of that plan, as is the case here, courts must take into account the inherent structural conflict of interest." *Boyles v. Am. Heritage Life Ins. Co.*, 226 F. Supp. 3d 497, 502 (W.D. Pa. 2016); *see also Guthrie v. Prudential Ins. Co. of Am.*, 625 F. App'x 158, 161 (3d Cir. 2015). This Court recognizes that Defendant has a structural conflict of interest, and duly weighs this conflict in its analysis.

"In accordance with these principles, the Court will apply a deferential arbitrary and capricious standard in reviewing Defendant['s] denial of Plaintiff's claim for total and permanent disability benefits under the [Policy]." *McDonald*, 2014 WL 4660683 at *4, *citing Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525–26 (3d Cir.2009).

## C. Analysis

Both parties have moved for summary judgment. Before turning to the merits, the Court will briefly summarize each party's positions.

In her motion for summary judgment, Plaintiff alleges that Defendant's decision to terminate her LTD benefits was arbitrary and capricious based on several "procedural anomalies" in Defendant's handling of her claim. Specifically, Plaintiff claims: (1) Defendant failed to demonstrate improvement in Plaintiff's condition before terminating her benefits; (2) Defendant refused to have Plaintiff physically examined; (3) Defendant's appeal review violated ERISA; (4) Defendant did not explain why it did not agree with Plaintiff's treating physicians; and (5) Defendant improperly relied on a defective EAR. (*See* ECF No. 57.) Additionally, Plaintiff claims (6) that Defendant improperly introduced a *post hoc* justification for its decision to deny Plaintiff's benefits in its briefings before this Court. (*See* ECF No. 62 at 15.)

29

Defendant claims that its decision to terminate Plaintiff's LTD benefits was not arbitrary and capricious. Defendant states that it considered all the evidence in the administrative record and contends that the evidence supported its decision to terminate Plaintiff's LTD benefits. Specifically, Defendant claims that: (1) Plaintiff's pain management specialists and the independent reviewing specialists believed that Plaintiff was capable of performing full-time work; (2) Defendant performed an EAR which indicated that Plaintiff could work several jobs given her physical restrictions; and (3) the ALJ determined that Plaintiff could perform full-time work. Defendant thus asserts that its "decision to terminate benefits was well supported, imminently reasonable, and certainly not arbitrary and capricious." (ECF No. 60, at 21.)

The Court will address these claims under the arbitrary and capricious standard of review. As described below, no reasonable juror could conclude that Defendant's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious. Therefore, Defendant is entitled to summary judgment.

## D. Plaintiff's Claims

### 1. Failure to Demonstrate Improvement

Plaintiff alleges that Defendant acted arbitrarily and capriciously because it terminated her LTD benefits without demonstrating that her condition had improved. (*See* ECF No. 57 at 9.) Specifically, Plaintiff claims that "after paying Ms. Potts STD and LTD benefits for over thirty-two (32) months—including two (2) months of Any Occupation benefits, Hartford abruptly changed its position and terminated Ms. Potts' LTD benefits." (*Id.*) Plaintiff further claims that Defendant denied her claim based on the same medical

30

evidence it had previously relied on in approving her claim. (*Id.* at 10.) As noted below, this Court disagrees with Plaintiff's arguments and finds that Defendant's failure to demonstrate improvement does not support a finding that its decision was arbitrary and capricious.

Defendant determined that Plaintiff was entitled to STD benefits, and then LTD benefits for the entirety of the Own Occupation period. Plaintiff's benefits were terminated after the Own Occupation period ended and Defendant determined that Plaintiff failed to meet the heightened standard for "disabled" that applies during the Any Occupation period. As Defendant avers, once the Own Occupation period ended, Defendant did not need to show that Plaintiff improved before it terminated her benefits. Rather, to continue to receive benefits, Plaintiff needed to establish that she was disabled under the more stringent definition of disability under the Any Occupation standard.

"Courts in this Circuit have repeatedly upheld an administrator's termination of LTD benefits when the test changed from 'own occupation' to 'any occupation' because the standard for continued payment of benefits is more rigorous under the 'any occupation' test." *Hoch v. Hartford Life & Acc. Ins. Co.,* No. CIV.A. 08-4805, 2009 WL 1162823, at *17 (E.D. Pa. 2009) (internal citations omitted); *see Miller v. Mellon Long Term Disability Plan,* No. CIV.A. 09-1166, 2011 WL 4345813, at *11 (W.D. Pa. 2011), aff'd, 478 F. App'x 720 (3d Cir. 2012) (noting that "Defendants did not 'reverse' their position" instead, while [Plaintiff] had presented evidence that she was initially disabled from her 'own occupation,' she provided no evidence that she continued to be disabled in August 2006, or that she was disabled from 'any occupation' as required by the Plan."); *see also Rodriguez v. Reliance*

*Standard Life Ins. Co.*, No. 12-CV-04810 SDW MCA, 2014 WL 1494523, at *3 (D.N.J. 2014) (finding no manifest error in decision to terminate benefits when "Plaintiff's benefits were terminated, in part, because the standard of approval became stricter and Plaintiff no longer qualified for benefits.")

Plaintiff cites *Miller v. Am. Airlines, Inc.*, 632 F.3d 837 (3d Cir. 2011) for the proposition that "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." *Id.* at 848. But in *Miller* the plaintiff's benefits were terminated *without* any change in the requisite level of disability that plaintiff needed to establish to receive benefits. Therefore, *Miller* has no bearing here.

Finally, Plaintiff suggests that Defendant acted arbitrarily because, once the Own Occupation period ended, Defendant paid Plaintiff Any Occupation benefits for two months before deciding to terminate her claim. (ECF No. 57 at 9.) This Court disagrees. As previously noted, Defendant clearly stated in its November 11, 2014 letter that the Own Occupation period had ended and that "[a]dditional benefits... should not be construed as an admission of continued liability." (ECF No. 240.) This Court declines Plaintiff's invitation to impose liability on Defendant because it provided Plaintiff with an additional two months of coverage after her Own Occupation benefits lapsed.

In sum, Defendant's failure to demonstrate improvement does not weigh in favor of a determination that Defendant's denial of Plaintiff's claim for LTD benefits was arbitrary and capricious.

*2. Failure to Conduct a Physical Examination of Plaintiff*

Plaintiff next contends that Defendant's denial of her LTD benefits was arbitrary and capricious because Defendant failed to conduct a physical examination of Plaintiff to determine her functional capacity. (ECF No. 57 at 12.)

This Court finds no authority to support Plaintiff's contention that Defendant was obligated to have Plaintiff undergo a medical examination as part of Defendant's review process. To the contrary, "numerous courts in [the Third C]ircuit have held that there is no legal requirement for a plan administrator to demand an independent medical examination as part of its review of a claim for disability benefits under an ERISA-governed plan, even if the plan permits it to do so." *Killian v. Hartford Life & Accident Ins. Co.*, No. CV 16-1377, 2017 WL 429905, at *14 (E.D. Pa. 2017), *citing Sollon v. Ohio Cas. Ins. Co.*, 396 F. Supp. 2d 560, 586 (W.D. Pa. 2005). "Indeed, ERISA does not require plan administrators to perform any physical examinations." *Killebrew v. Prudential Ins. Co. of Am.*, No. 3:15-CV-01415, 2017 WL 1519500, at *18 (M.D. Pa. 2017), citing *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 296 (W.D. Pa. 2008). Instead, "a decision to forego an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall assessment of the reasonableness of the administrator's decision-making process." *Killian*, 2017 WL 429905 at *14, *citing Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 563 (W.D. Pa. 2009); *see also Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250 *, 2016 U.S. Dist. LEXIS 53286 (E.D. Pa. 2016) (same).

In this instance, Defendant's decision to forgo a physical examination was not arbitrary and capricious. While Plaintiff's pain management specialist, Ms. Jones, had

recommended that Plaintiff obtain functional capacity testing on two occasions in late 2012 (AR. 0905; AR. 0943), in July of 2013 she reported that Plaintiff could perform "light" or "sedentary work" on a "full-time basis." (AR. 0730; AR. 0733.) Further, while Dr. Kern indicated on several occasions that Plaintiff was unable to work on a full-time basis (*see, e.g.,* AR. 0685; AR. 0674; AR. 0621), her statements about Plaintiff's functional capacity were inconsistent.[2]

Certainly Defendant had the option to refer Plaintiff to functional capacity testing before terminating her LTD benefits. However, based on the record before it, Defendant had sufficient evidence to reasonably determine that a physical examination was not needed; Ms. Jones, who was treating Plaintiff for pain, reported that Plaintiff could return to full-time work; Dr. Kern, who made it clear that she was *not* treating Plaintiff for pain, provided inconsistent opinions and indicated on two occasions that she would defer to pain management; two independent record reviewers, Drs. Sood and Siebel, also determined that nothing in Plaintiff's medical file indicated that she could not perform full-time light or sedentary work. In sum, given the record before it, Defendant's decision not to seek a physical examination was not "without reason, unsupported by substantial

---

[2] For instance, Dr. Kern first said she would "defer to pain mgmt," who, as stated above, had reported that Plaintiff could perform "light" or "sedentary work" on a "full-time basis." (AR. 0692-93.) Then, on November 20, 2013, Dr. Kern advised Defendant to "[p]lease note, I am not treating any condition" of Plaintiff's, but then proceeded to state that she did not believe that Plaintiff could work full-time; this contradicted her prior statement that she would "defer to pain mgmt." (AR. 0674.) In a June 1, 2014 note, Dr. Kern stated that she was "only treating chole[sterol]," noted that Plaintiff's work abilities were "not assessed this visit," and once again advised Defendant to "consult pain management" to determine Plaintiff's functional capabilities. (AR. at 0612.) As noted above, pain management had stated that Plaintiff could return to light or sedentary full-time work.

evidence or erroneous as a matter of law," as required under the arbitrary and capricious standard. *Miller*, 632 F.3d at 845 (internal citations omitted).

Plaintiff further argues that Defendant's breached the express terms of the Policy because it failed to have Plaintiff physically examined. (ECF No. 57 at 12-13.) This argument is easily dismissed. The Policy reads, in the relevant part, "We have the right to require You to: ... be examined by a Physician...". (AR. 0025.) A plain reading of the Policy clearly indicates that Defendant had a right, but not an obligation, to submit Plaintiff to a physical examination. Furthermore, Plaintiff cites no authority to support her argument that she was entitled to a physical examination. *See Griffin v. Hartford Life & Accident Ins. Co.*, No. 6:16-CV-00024, 2017 WL 384384, at *6 (W.D. Va. Jan. 25, 2017) ("This Court is not aware of, and Plaintiff has not provided, a case supporting Plaintiff's contention that a provision such as this should be interpreted as a requirement rather than a right.")

Plaintiff's next argues that Defendant breached the terms of the Policy because the Policy did not permit Defendant to conduct a record review, and because the record reviewers were not licensed to practice medicine in Pennsylvania. (ECF No. 57 at 13.) Neither of these arguments is persuasive.

Nothing in the Policy prohibits Defendant from conducting a record review. Plaintiff correctly notes that the Policy states that "We have the right to require You to: ... be examined by a Physician, vocational expert, functional expert, or other medical or vocational professional of Our choice." (AR. 0025; ECF No. 57 at 13.) However, Plaintiff has not come forward with any evidence that the Policy restricts Defendant to requiring

Plaintiff to undergo a physical examination, nor identified any section of the Policy that prevents Defendant from conducting a record review.

Furthermore, nothing in the Policy requires that record reviewers meet the Policy's definition of "Physician" or be licensed to practice in the jurisdiction where Plaintiff receives care. Plaintiff correctly observes that the Policy defines "Physician" as someone "licensed to practice in the jurisdiction where care is being given." (AR. 0030.) However, Defendant also has the right to have Plaintiff examined by a "vocational expert, functional expert, or other medical or vocational professional of Our choice;" (AR. 0025.) clearly, these persons are not "Physicians" and therefore nothing in the Policy requires that any of these persons be licensed in the jurisdiction where Plaintiff receives care. Further, the Policy does not prevent Defendant from seeking a record review, and Plaintiff has not cited any language from the Policy that requires that a record reviewer be from the jurisdiction where care is given.

Finally, Plaintiff argues that she was required to undergo a physical examination because pain is subjective. (ECF No. 57 at 16.) However, Plaintiff cites to cases that do not hold that a physical examination is required whenever a patient experiences pain. For instance, while Plaintiff cites *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008), in that case the Ninth Circuit merely noted that "individual reactions to pain are subjective and not easily determined by reference to objective measurements;" it did not announce a rule requiring a physical examination. Plaintiff next cites an excerpt from *Moustafa v. ReliaStar Life Ins. Co.*, 2016 U.S. Dist. LEXIS 155257 (D.N.J. 2016) that discusses *Kelly v. Reliance Standard Life Ins. Co.*, No. CIV.A. 09-2478 KSH, 2011

WL 6756932 (D.N.J. 2011). In *Kelly*, the court held that the denial of plaintiff's LTD benefits was arbitrary and capricious because defendant failed to conduct a physical examination and "gave no independent weight to the opinion of the only physician that actually treated [plaintiff]." 2011 WL 6756932 at *8. As discussed above, the pain management specialist who treated Plaintiff stated that she was capable of returning to "light" or "sedentary work" on a "full-time basis." (AR. 0730; AR. 0733.)

Plaintiff also cites *Songer v. Reliance Standard Life Ins. Co.*, 106 F. Supp. 3d 664 (W.D. Pa. 2015), appeal dismissed (Aug. 7, 2015), but this case merely states that the failure to obtain a physical examination "*may be unreasonable*" in certain circumstances (emphasis added); it does not require a physical examination, much less hold that the failure to obtain one is arbitrary and capricious. *Id.* at 675. Finally, in *Gessling v. Grp. Long Term Disability Plan for Employees of Sprint/United Mgmt. Co.*, 693 F. Supp. 2d 856 (S.D. Ind. 2010), plaintiff's "treating physician... repeatedly opined that [plaintiff] was disabled from performing the duties of his own occupation...". *Id.* at 864. Here, the specialist who treated Plaintiff for pain stated that she could return to "light" or "sedentary work" on a" full-time basis." (AR. 0730; AR. 0733.)

In sum, Plaintiff has failed to persuade this Court that Defendant's failure to obtain a physical examination of Plaintiff before terminating her LTD benefits weighs in favor of Defendant's claim decision as being arbitrary and capricious.

### 3. *Appeal Decision*

Plaintiff claims that Defendant violated ERISA's requirement that there be a "full and fair review of the claim and the adverse benefit determination." *See* 29 C.F.R. 2560.503-

1(h)(3)(i). In its letter denying Plaintiff's appeal, after Defendant stated that Plaintiff was capable of returning to full-time work, Defendant stated that the EAR, which had been performed pursuant to Defendant's initial decision to deny Plaintiff's LTD benefits, "remains valid." (AR. 0219.) Plaintiff claims that Defendant violated ERISA because its appeal decision "relied on" the same EAR that had been generated during the initial review that resulted in Plaintiff's claim being denied. This Court rejects Plaintiff's claim.

Under ERISA, Defendant is required to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination...". 29 C.F.R. 2560.503-1(h)(3)(ii). When considering an appeal, Defendant "shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." (*Id.* at (h)(3)(ii)). Further, "the health care professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal...". *Id.* at (h)(3)(v).

Defendant clearly complied with these requirements. Plaintiff does not dispute that, for purposes of deciding Plaintiff's appeal, Defendant obtained record reviews from three Board Certified medical professionals with "experience in the field of medicine involved in the medical judgment," who played no part of the initial decision to deny Plaintiff's claim. Rather, Plaintiff suggests that the appeal decision was improper because *after* these three medical professionals reported that Plaintiff was not disabled, and *after* Defendant again decided to deny Plaintiff's claim, Defendant then determined that the EAR previously performed was "still valid."

Plaintiff fails to recognize that the Employability Analysis was not part of any "medical judgment." Defendant generated the EAR *after* Defendant determined, based on its review of Plaintiff's file, that Plaintiff was not disabled under the Any Occupation standard. Moreover, under this Court's reading of the regulation, nothing prevents Defendant from determining that the initial EAR is still valid, *after* Plaintiff's appeal was denied following consultations from independent health care professionals not involved in making the original medical judgment.

In sum, the fact that Defendant determined that the EAR was still valid does not weigh in favor of a determination that the denial of Plaintiff's claim for LTD benefits was arbitrary and capricious.

*4. Adequacy of Explanation for Denying Plaintiff's Claim for LTD Benefits*

Plaintiff claims that Defendant's denial letter failed to explain why Defendant "disagreed with [Plaintiff's] treaters." (ECF No. 57 at 18.) Plaintiff further claims that "to the extent that [Defendant] sought to rely on its non-treating doctors, it was required to explain why it accepted their medical opinions over [Plaintiff's] treaters in its initial termination letter so that [Plaintiff] could have the opportunity to respond." (*Id.* at 19.) According to Plaintiff, Defendant's failure to do so weighs in favor of a determination that Defendant's benefits decision was arbitrary and capricious.

Defendant avers that Plaintiff is, in effect, attempting to conflate two rules into one. According to Defendant, the first question "is the substantive one of whether [Defendant] terminated the claim for an improper reason...". (ECF No. 64 at 17.) The second is the "procedural question of whether [Defendant] failed to provide an opportunity for Plaintiff

39

to respond to the reason for its determination...". (*Id.*) Defendant asserts that, contrary to Plaintiff's contention, it is not required to explain, in the initial denial letter, why it credited opinions of the independent record reviewers over the opinions of certain of Plaintiff's treating physicians. (*See Id.* at 17-20.)

Courts may not "impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 824, 123 S. Ct. 1965, 1967, 155 L. Ed. 2d 1034 (2003); *Steele v. Boeing Co.,* 225 F. App'x 71, 75 (3d Cir. 2007); *Neptune v. Sun Life Assur. Co. of Canada,* No. 10-CV-2398, 2013 WL 5273785, at *12 (E.D. Pa. 2013); *Dinote v. United of Omaha Life Ins. Co.,* 331 F. Supp. 2d 341, 348 (E.D. Pa. 2004). "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker,* 538 U.S. at 834; *Cerneskie v. Mellon Bank Long Term Disability Plan,* 142 F. App'x 555, 558 (3d Cir. 2005) (same). However, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker,* 538 U.S. at 825; *Cerneskie,* 142 F. App'x 558 ("under ERISA, no special deference [is] due to treating physicians"); *Creelman v. Carpenters Pension & Annuity Fund of Philadelphia & Vicinity,* 945 F. Supp. 2d 592, 604 (E.D. Pa. 2013) (ERISA plan administrator need not "accord deference to a treating physician's opinion."). "[N]or must [a plan administrator] explain a decision to credit medical evidence that conflicts with the report of a treating physician." *Creelman,* 945 F. Supp. 2d at 604, *citing Black & Decker,* 538 U.S. at 834; *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 257–58 (3d Cir. 2004); *Shatto,* 2016 WL 5374106 at 13 (same).

This Court rejects Plaintiff's argument that Defendant was required to explain all of its bases for disagreeing with Plaintiff's treating physicians in its denial letter.[3] As noted above, Defendant was not required to give any extra weight to the opinions of Plaintiff's treating physicians and, contrary to Plaintiff's contention, did not have a "discrete burden of explanation." *Black & Decker*, 538 U.S. at 824. Moreover, "[a] denial letter is substantially compliant with the regulations when the claimant is provided a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Morningred v. Delta Family-Care & Survivorship Plan*, 790 F. Supp. 2d 177, 194 (D. Del. 2011), clarified on denial of reconsideration (June 30, 2011), aff'd, 526 F. App'x 217 (3d Cir. 2013).

The denial letter clearly complied with these requirements. It listed the sources of information that Defendant relied on in making its decision; it noted that Drs. Sood and Siebel concluded that Plaintiff could work subject to certain restrictions and limitations, and it described these restrictions and limitations in detail; it stated that, based on Plaintiff's

---

[3] The court notes that the cases Plaintiff cites to support this argument do not establish the rule Plaintiff asks this Court to adopt. For instance, in *Morgan v. The Prudential Insu. Co. of Am.*, 755 F. Supp. 2d 639 (E.D. Pa. 2010), the issue was not that the letter itself did not sufficiently explain the decision to deny benefits, but rather that the decision to deny benefits was unreasonable. Similarly, in *Holmes v. Metro. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 122525, 2011 WL 4916405 (M.D. Pa. 2011), the issue was not the denial letter itself but the fact that of four doctors who rendered medical opinions, only one "seems plausibly to support" the denial of benefits. *Id.* at 30. Furthermore, *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261 (W.D. Pa. 2008) was a fact-specific holding that the letter was deficient because there was "strongly divergent" evidence regarding plaintiff's fibromyalgia, yet the letter merely stated that "all documentation necessary to render a decision" had been considered; the letter did not state which specific evidence had been reviewed, and did not mention at all why the insurer did not credit the opinions of plaintiff's treating physicians. *Id.* at 294-95.

41

restrictions and limitations, an EAR had been performed showing that Plaintiff was qualified for six occupations, and listed these six occupations; and it informed Plaintiff of her right to appeal and explained how Plaintiff could exercise that right. (AR. 0228.)

This Court further finds that Defendant did not "arbitrarily refuse to credit" Plaintiff's "reliable evidence" from her treating physicians. *Id*. at 834. Defendant conducted a thorough review of Plaintiff's medical file. Defendant obtained two independent physicians to conduct record reviews, Drs. Sood and Siebel. Based on their reports, Defendant reasonably determined that the record lacked "reliable evidence" that Plaintiff was physically disabled under the Any Occupation standard. Defendant accordingly denied Plaintiff's claim for LTD benefits.

In terms of her physical capabilities, Plaintiff admits that her "treating pain management specialist, DNP Jones, confirmed that Plaintiff could work." (ECF No. 63 at 5.) Moreover, Dr. Kern's assessment about Plaintiff's functional capacity was inconsistent; Dr. Kern reported that Plaintiff could not work full-time on November 23, 2013 and again on May 20, 2014 (see AR. at 0673, 0621) and had previously opined that she was a "poor work candidate" on January 8, 2014. (AR. 0594) But in the November 23, 2013 letter where she said Plaintiff could not work, Dr. Kern herself noted that she was "not treating any condition." (AR. 0674) Further, Dr. Kern previously stated that she would "defer to pain mgmt" about Plaintiff's functional capacity. (AR. 0692-93.) The Court further notes that, as far as this Court can determine from its reading of the record, the last time that Dr. Kern commented on Plaintiff's work capacity before Plaintiff's benefits were terminated was in the APSF dated "6/1/14," where Dr. Kern stated that Plaintiff "sees pain mgmt. monthly to

42

treat pain," noted that "we are only treating chole[sterol]," and directed Defendant to "consult pain mgmt" regarding Plaintiff's work abilities because they were "not assessed this visit." (AR. 0611-612.) Given this evidence, Defendant reasonably decided that Dr. Kern's statements did not indicate that Plaintiff was disabled under the Any Occupation standard. And Defendant reasonably determined after a thorough review that it was crediting the opinions of Ms. Jones and Drs. Sood over that of Dr. Kern with regards to Plaintiff's physical ability to work.

Defendant's denial letter explicitly stated that, based on her "Mental Nervous Review," Dr. Siebel concluded that there was "no objective information or intensity of treatment that supports psychiatric restrictions and limitations." (AR. 0227.) While the denial letter did not say so explicitly, Dr. Siebel's opinion that the record did not indicate that Plaintiff required psychiatric restrictions is clearly a response to Dr. Kammiel's opinion that Plaintiff was "unable to work due to impact of physical pain on her mood, and depression." (AR. 0580.) While Defendant's denial letter could have made it more clear that it was crediting Dr. Siebel's medical opinion over Dr. Kammiel's, the letter explained why Defendant was doing so—because, according to Dr. Siebel, Dr. Kammiel's opinion on Plaintiff's work capacity was not supported by objective evidence or the intensity of treatment that Plaintiff had received.

Plaintiff further asserts that Plaintiff did not have an opportunity to respond to the denial because Defendant did not explain why it disagreed with Plaintiff's treaters until the

43

appeal denial letter. This argument is unpersuasive.[4] As noted above, Defendant did not have a special burden to explain why it disagreed with Plaintiff's treaters, and Defendant's denial letter gave Plaintiff a "sufficiently clear understanding of the administrator's position to permit effective review." *Morningred*, 790 F. Supp. 2d at 194.

In sum, this Court does not find that the content of either the initial denial letter nor the appeal denial letter weighs in favor of a finding that denial of Plaintiff's LTD benefits claim was arbitrary and capricious.

*5. Employability Analysis Report*

Next, Plaintiff asserts that Defendant's EAR was flawed. Specifically, Plaintiff alleges that (1) the report did not consider and apply Plaintiff's limitations to each of the jobs identified; (2) was based on outdated information that has not been updated since 1977; (3) failed to rely on all of the medical evidence in Plaintiff's file, and (4) did not take into account the prerequisites, skills, and job training required for the proposed jobs. (ECF NO. 57 at 20.) As noted below, none of these arguments is persuasive.

Plaintiff's first argument is misguided. Contrary to Plaintiff's assertion, the EAR included a detailed discussion of Plaintiff's functional capacities (AR. 0512-513) and a long list of Plaintiff's various limitations and restrictions. (AR. 0515-516.) Further, the jobs

---

[4] Plaintiff cites *Bradley v. Liberty Life Assur. Co.*, 2016 U.S. Dist. LEXIS 80895 (D.N.J. 2016) to support this argument. However, in *Bradley* the appeal letter not only reaffirmed that Plaintiff's claim was being denied; it *"additionally* [stated that Plaintiff] was not undertaking the appropriate available treatment to obtain disability benefit[s] under the Plan." *Id.* at 27. Unlike in *Bradley*, Defendant's denial letter merely elaborated on the issues already raised in the initial denial letter, i.e. that Plaintiff had failed to demonstrate that she met the definition of "disabled" under the Any Occupation standard; it did not give an additional basis for why it denied Plaintiff's claim in the first place.

that Plaintiff was matched with were determined based on Plaintiff's functional limitations and restrictions. Moreover, the EAR contained a lengthy description of the requirements of each job Plaintiff was matched with. (AR. 0519-531.) While the denial letter did not specifically state what the specific physical requirements were for each of the jobs, this is of little consequence because Plaintiff was only matched with jobs in the first place that Plaintiff could perform given her restrictions and limitations.

Plaintiff cites *Gardner v. Unum Life Ins. Co. of Am.*, 354 F. App'x 642 (3d Cir. 2009) to support her contention that the EAR was flawed. In *Gardner*, the Third Circuit noted that the insurer "was under a duty to make a reasonable inquiry into the types of skills [plaintiff] possesses, and whether they transfer to another job in which she can be gainfully employed as defined by the policy." *Id*. at 649. In *Gardner*, the court held that it could not determine whether the plan administrator fulfilled its duty, because "[t]he record sheds little light on the depth of [the plan administrator's] vocational analyses." *Id*. Unlike in *Gardner*, the record indicates that Defendant clearly fulfilled its duty. Defendant took into account the restrictions listed by Drs. Sood and Siebel, and matched Plaintiff with jobs based on her limitations.

Plaintiff's invocation of *Havens v. Cont'l Cas. Co.*, 186 F. App'x 207 (3d Cir. 2006) is similarly unpersuasive. In *Havens*, the Third Circuit reversed the District Court's judgment in favor of defendant, holding that "on the record presented here, [plaintiff] is 'disabled' from 'any occupation,' as those terms are used in his contract of long-term disability insurance with [defendant]." *Id*. at 213. Despite the fact that in *Havens* the record clearly indicated that plaintiff had "specific and stringent restrictions" regarding her work

45

capacity, "[t]he expert's report simply listed a few general factors considered and then named the three [alternative] occupations," without explaining the physical requirements of those occupations or describing how the expert arrived at these occupations. *Id.* Unlike in *Havens*, Defendant's expert stated how he arrived at the occupations listed in the report, namely by inputting Plaintiff's restrictions and limitations and identifying jobs that Plaintiff could perform given those parameters.

Plaintiff next claims that the EAR "relied upon outdated information [because a]ll of the occupations identified in the Employability Analysis relied on job descriptions contained in the Dictionary of Occupational Titles ('DOT') which were last updated in 1977." (ECF No. 57 at 21.) However, "the Department of Labor replaced the DOT with the Occupational Information Network (O*NET), a database that is continually updated based on data collection efforts that began in 2001...". *Feeley v. Comm'r of Soc. Sec.*, No. CIV. 14-4970 KM, 2015 WL 3505512, at *10 (D.N.J. 2015); *Cunningham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010) (same). In fact, the EAR provided an "O*NET Code number" for each job Plaintiff was matched with. Plaintiff has presented no evidence that the descriptions for the specific jobs Plaintiff was matched with have not been updated since 1977.

Plaintiff further claims that the EAR was flawed because it did not consider "all" of Plaintiff's medical evidence. (ECF No. 75 at 22.) Specifically, Plaintiff notes that the EAR only used functional capacities from Drs. Sood and Siebel and failed to take into account the opinions of Plaintiff's treaters. (*Id.*) However, as noted above, Drs. Sood and

Siebel considered notes and reports from Plaintiff's treating physicians when reaching their own conclusions about Plaintiff's restrictions.

Finally, Plaintiff argues that the EAR violated the terms of her Policy. Plaintiff notes that her Policy defines Any Occupation as a job "for which You are qualified by education, training, or experience." (AR. 0028.) Plaintiff states that this provision was violated because the jobs listed in the EAR all have a "Specific Vocational Preparation" ("SVP") score of 3 or higher, meaning that, at a minimum, they would entail one to three months of training before Plaintiff were qualified; in fact, the SVP for the "Closest" match is 5, requiring from 6 months to 1 year of training. (ECF No. 57 at 23.) However, Plaintiff fails to recognize that the fact that SVP "includes training" such as "[e]ssential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify)." (Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer, https://occupationalinfo.org/appendxc_1.html#II (last visited September 11, 2017)).

This Court also notes that the EAR states that Plaintiff's "[w]ork history is reported as General Manager-Area Training Manager" from 1994 to 2012. (AR. 0512.) Given that Plaintiff has eighteen years of relevant experience, it is unlikely that extensive training will be required for her to transition to jobs that are "Closest" or "Good" matches. Moreover, "it is disingenuous of Plaintiff to argue [s]he is not qualified for Closest matches because of the minimum training requirement, when Closest is the highest category of match available in this type of report." *Griffin v. Hartford Life & Accident Ins. Co.*, No. 6:16-CV-00024, 2017 WL 384384, at *8 (W.D. Va. 2017) (denying plaintiff's claim

47

that job matches impermissibly required additional job training when the "Closest"
matches were SVP 4 or higher.)

In sum, this Court finds that Defendant's EAR does not weigh in favor of a finding
that termination of Plaintiff's benefits was arbitrary and capricious.

*6. Social Security Denial*

Finally, Plaintiff claims that Defendant argued for the first time before this Court
that part of the reason why it rejected Plaintiff's claim for LTD benefits was because the
ALJ previously denied her claim for social security benefits. (ECF No. 62 at 21-22.)
Plaintiff argues that Defendant thus improperly relied on a *post hoc* argument to support
its decision. However, in the letter denying Plaintiff's appeal, Defendant noted that
Plaintiff's application for Social Security Disability Benefits had been "denied by the
Administrative Law Judge." (AR. 0216.) Plaintiff seems to suggest that, because
Defendant raised the fact of the Social Security denial in response to Plaintiff's assertion
that Defendant required her to apply for Social Security benefits, the Social Security denial
does not constitute a distinct "argument" for why Defendant denied her claim.

Without getting into a theoretical or semantic discussion about what constitutes an
"argument," this Court simply notes that the appeal denial letter explicitly mentioned that
the ALJ had denied Plaintiff's Social Security claim. Therefore, the fact that Defendant
reiterated this fact in its briefings before this Court does not weigh towards a finding that
its denial of Plaintiff's claim was arbitrary and capricious.

## VI.    Conclusion

In conclusion, this Court finds that Plaintiff has failed to meet her burden to establish that Defendant's denial of her claim for LTD benefits was arbitrary and capricious. Therefore, Plaintiff's motion for summary judgment will be denied, and Defendant's motion for summary judgment will be granted. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER POTTS, | ) | |
| | ) | CIVIL ACTION NO. 3:16-35 |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| HARTFORD LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this 28th day of September, 2017, upon consideration of the Plaintiff's
motion for summary judgment (ECF No. 56), Defendant's motion for summary judgment
(ECF No. 59), and for the reasons set forth in the accompanying memorandum opinion, **IT
IS HEREBY ORDERED** as follows:

1.      Plaintiff's motion to for summary judgment is (ECF No. 56) is **DENIED**.

2.      Defendant's motion for summary judgment (ECF No. 59) is **GRANTED**

with respect to all of Plaintiff's claims, which are dismissed with prejudice.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE